UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JONATHAN BROWN,<br><br>        Plaintiff,<br><br>v.<br><br>DAIRYLAND INSURANCE COMPANY,<br>a subsidiary of SENTRY INSURANCE<br>COMPANY,<br><br>        Defendants. | Case No. 4:25-cv-4009<br><br><br>**COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

Plaintiff Jonathan Brown, by and through his counsel, Cutler Law Firm, LLP, for his causes of action against the above-named Defendants, states and alleges as follows:

**THE PARTIES**

1.      Plaintiff Jonathan Brown ("***Jon***") is a resident of Sioux Falls, South Dakota.

2.      Upon information and belief, at all relevant times hereto, Defendant Dairyland Insurance Company ("***Dairyland***") is an insurance company existing and incorporated under the laws of the State of Wisconsin with its principal place of business in the State of Wisconsin, which sold property and casualty insurance in the State of South Dakota.

3.      Upon information and belief, Sentry Insurance Company ("***Sentry***") is an insurance company existing and incorporated under the laws of the State of Wisconsin with its principal place of business in the State of Wisconsin, which sells property and casualty insurance in the State of South Dakota.

4.      Upon information and belief, Dairyland is a wholly owned subsidiary of and is controlled by Sentry (Dairyland and Sentry collectively referred to as "***Defendants***").

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under the diversity of citizenship provisions of 28 U.S.C. § 1332.

2.      The amount in controversy between the Plaintiff and the Defendants exceeds the sum of $75,000, exclusive of interest and costs.

3.      Venue is proper in the District of South Dakota under 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims involved occurred in South Dakota.

## FACTUAL BACKGROUND

4.      On July 14, 2023, Jon was driving his motorcycle northbound on Interstate 43 in or around Milwaukee, Wisconsin.

5.      Jon's wife, Angie Brown ("*Angie*"), was riding as a passenger on the motorcycle directly behind Jon.

6.      As Jon and Angie were travelling over a bridge on I-43 near West Bruce Street, a motor vehicle travelling behind them ran into the rear end of their motorcycle.

7.      The impact from the collision bent the frame of Jon's motorcycle and caused nearly $15,000 in damage to the motorcycle.

8.      The driver of the motor vehicle that hit Jon and Angie fled the scene.

9.      The Milwaukee County Sheriff's Department located and identified the owner of the motor vehicle as Miriam Gonzalez.

10.      Upon information and belief, Miriam Gonzalez was cited with and pled guilty to failing to stop at the scene of an accident in violation of Wis. Stat. § 346.675(1).

11.      Jon was without fault in the collision.

12.     Jon and Angie sustained serious injuries in the collision.

13.     As a result of this collision, Jon has undergone medical treatment including, but not limited to, evaluation and treatment at an emergency department, CT scans, chiropractic care, physical therapy, trigger point injections, an MRI, two sets of medial branch blocks, and two cervical radiofrequency ablations ("**RFA**") thus far.

14.     As a legal result of the collision, Jon has incurred over $60,000 in medical bills.

15.     As a legal result of the collision, Jon suffered injuries which caused physical pain and suffering.

16.     As a legal result of the collision, Jon suffered injuries which caused mental and emotional anguish, anxiety and distress.

17.     As a legal result of the collision, Jon suffered injuries which caused loss of enjoyment of life.

18.     As a legal result of the collision, Jon suffered injuries which caused disability.

19.     As a legal result of the collision, Jon suffered injuries which will require medical treatment in the future, cause him to incur medical bills in the future, and cause him pain and suffering, mental anguish, anxiety, loss of enjoyment of life, disability, emotional distress, anxiety, anguish and embarrassment, amongst other damages, in the future.

20.     The total amount of compensatory damages Jon is legally entitled to recover from Miriam Gonzalez in the crash exceeds $250,000.00.

21.     At the time of the collision, Jon and Angie were covered by a $500,000 policy of motorcycle insurance (the "**Policy**") that was sold to them by Dairyland and, upon information and belief, Sentry.

22.    The Policy provided Uninsured Motorist ("*UM*") Benefits with policy limits of $250,000 per person.

23.    Jon is entitled to UM benefits under the Policy because the motor vehicle owned and operated by Miriam Gonzalez was not insured.

24.    The Policy requires that, subject to the limits of the UM coverage, Dairyland and/or, upon information and belief, Sentry, will pay Jon UM benefits equal to the total compensatory damages Jon was legally entitled to recover from Miriam Gonzalez for bodily injuries he sustained in the crash.

25.    The premiums for the Policy were current at the time of the collision.

26.    The coverage under the Policy was in full force and effect at the time of the collision.

27.    Defendants were notified of Jon's UM claim in a timely manner.

28.    Upon information and belief, the claims adjuster, Rachel Leech (the "***Adjuster***"), that adjusted Jon's bodily injury claim for UM benefits, was at all times relevant hereto, an employee of Sentry.

29.    Upon information and belief, the Adjuster was subject to Sentry's policies and procedures when adjusting Jon's claim for UM benefits under the Dairyland-branded Policy.

30.    Jon provided the Adjuster with documentation supporting his claim for UM benefits.

31.    On or about July 15, 2023, Dairyland and, upon information and belief, Sentry requested that Jon answer questions about the collision in a recorded interview and he agreed to do so.

32.    During the recorded interview, Jon provided the following information, among other details:

    a.    Miriam Gonzalez's name, address, and license plate number;

b.   There were at least two witnesses to the crash;

c.   His motorcycle was towed;

d.   They were "minding their own business and got hit";

e.   They "were on a bridge very high up" when they were hit;

f.   Getting hit "felt like the hand of God pushing his bike forward";

g.   His "neck got jerked back" when they got hit;

h.   His neck was "very very sore" the next day; and

i.   He went to the emergency room at Aurora Health in Milwaukee, got a CT scan, and was diagnosed with whiplash and neck strains.

33.    On August 10, 2023, Angie Brown sent copies of Jon's medical bills via email to the Adjuster.

34.    On August 29, 2023, Jon's attorney sent a letter of representation to the Adjuster by email which provided, in part, "[t]his will confirm . . . that my clients have $250,000 in UM/UIM coverage.  Finally, because of the coverage questions, I am placing you on notice of the possibility of a UM/UIM claim."

35.    On September 18, 2023, Jon's attorney sent an email to the Adjuster that attached a letter from Progressive Universal Insurance Company confirming there was no applicable insurance coverage for the motor vehicle owned by Miriam Gonzalez that was involved in the collision.

36.    On September 20, 2023, Jon's attorney sent a letter by email to the Adjuster providing a status update on his injuries and treatment. This letter included information such as the following, among other details:

a.   A description of the treatment Jon had gotten or anticipated getting, including an emergency room visit, chiropractic care, and counseling;

b.   The names of the practitioners or clinics Jon had treated with for his injuries from the collision at that time;

5

    c. A description of the pain and symptoms Jon had been having, including neck and back pain and worsening anxiety;

    d. That the collision had taken away Jon's only hobby for the rest of the season, riding motorcycle;

    e. A photograph of a map which showed each city that Jon and Angie had visited on their motorcycle;

    f. A copy of a letter sent by Jon's attorney to a witness of the collision which documented the witness's observations, including statements such as "you mentioned that from the way you saw Jon and Angie get hit, there had to be some terrible whiplash involved" and "you observed Jon was so shaken up he could hardly move for awhile after the collision," among others;

    g. A copy of the police report for the subject collision; and

    h. A copy of a document reflecting the status of pending charges against Miriam Gonzalez in the State of Wisconsin.

37.    On September 23, 2023, Jon's attorney sent an email to the Adjuster correcting one of the names of the treating practitioners identified in the September 20, 2023, letter and provided that Jon would be seeing Dr. Thomas Ripperda, "a physical medicine and rehabilitation doctor tomorrow at Avera," the following day.

38.    On February 6, 2024, Jon's attorney sent another status update letter to the Adjuster by email, including with this letter the following information and documentation concerning Jon's injuries from the crash and his treatment over the past four months, among other details:

    a. Jon received chiropractic care and physical therapy to first try and take care of his neck pain and had been using "scraper for soft tissue release," "cupping," "cold laser therapy," Biofreeze, a heating pad, ice packs, and an ice roller in conjunction with that treatment;

    b. Jon then tried ultrasound treatment with a machine that "uses heat and energy to cause waves to travel through the skin to the tissues underneath. The skin and muscles vibrate and heat up. The goal is to increase circulation, decrease pain, increase flexibility and speed healing. Ultrasound accomplishes this by helping the fluids in the soft tissue flow better. This results in more lymph, which is an

6

important fluid that transports white blood cells throughout the body, passes through the tissues;"

c.  When ultrasound treatment did not work, Dr. Ripperda "performed trigger point injections on Jon's neck.  The injection is made with anesthetic and steroids and is intended to help the muscle relax" but the injections "did not provide lasting relief, so Dr. Ripperda did not continue to repeat them;"

d.  The trigger point injections "did not provide lasting relief," so Dr. Ripperda had Jon undergo an MRI to rule out other causes for his neck pain such as a disk herniation.  The MRI was negative for a herniation;"

e.  "Dr. Ripperda told Jon he has pretty classic facet joint injury from the crash and that they can perform medial branch blocks and then, if the blocks work, a [RFA];"

f.  A description as to the location of the facet joints, "each vertebral segment in the spine" "connected to two medial branch nerves", the function of the facet joints, to "give us flexibility in our spine," and medial branch nerves, to "carry signals, including pain signals, away from the joints to the spine and brain;"

g.  "In a medial branch block, the doctor will inject a local anesthetic and then place a needle near the spine to reach the exact facet joint that is the source of the pain.  The doctor uses fluoroscopy to guide the progress of the needle to the correct position.  A mixture of anesthetic and a steroid is injected into the area.  The goal of the block is to temporarily interrupt the pain signal coming from the nerve near the facet joint;"

h.  The RFA procedure "is intended to provide pain relief by using radiofrequency waves to target the medial branch nerves with the goal of interrupting the pain signals to the brain.  The doctor injects a local anesthetic and then puts a needle near the spine to reach the exact facet joint that is the source of the pain.  The doctor uses fluoroscopy to guide the progress of the needle to the correct position.  The doctor then injects a numbing agent to minimize pain.  An electrified probe is inserted, and it heats up the medial branch nerve tissue, causing a lesion that blocks the pain signal from reaching the brain."

i.  Jon had medial branch blocks performed on November 9, 2023, and November 17, 2023, and Jon "was not ready for how painful" the procedure would be;

j.  Jon got "good pain relief" from the medial branch blocks.  "After the second set of blocks, Jon was able to get a bunch of things done around the house that have been neglected, until the block wore off, and then he was pretty miserable, but this was probably from overdoing it;"

k.  Jon had the RFA done on December 6, 2023;

l.   Per his doctor, Jon was anticipated to have 6-9 months of good pain relief and then he would need another RFA;

m.   "Jon has counted almost 100 times that a needle has been stuck into his neck for one purpose or another after this motorcycle crash.  The number of times he had this done before this crash was 0.  He does not consider himself to have a low pain tolerance, but these injections and procedures have been rough for him.  He has felt like he was going to pass out at times and has needed extra help from the staff;"

n.   "He has had injections in his neck and taken more Tylenol and ibuprofen and been to more doctor appointments since the crash than he has in his whole life before this;"

o.   Photographs depicting the scraper, cupping, cold laser therapy, Biofreeze, the heating pad, the ice pack, the ice roller, and the ultrasound machine; and

p.   Links to videos showing how the procedures for medial branch blocks and RFAs are generally performed.

39.   Jon's attorney concluded the February 6, 2024, letter with the following advisement: "[p]lease adjust your reserves upward accordingly based on this information.  I anticipate that we are nearing the time when we will make a policy limits settlement offer for the value of Jon's case[.]"

40.   On February 14, 2024, Jon's attorney mailed a flash drive to the Adjuster containing copies of Jon's medical records from Avera Physical Medicine and Rehabilitation, and his medical bills from ERMED, Avera McKennan, and Aurora Healthcare.

41.   On March 13, 2024, Jon's attorney sent a letter to the Adjuster conveying Jon's first request for a tender of the applicable limits under the Policy by April 14, 2024.

42.   The March 13, 2024, letter provided, among other details, the following information:

a.   "Jon had a [RFA] procedure on December 6;"

b.   Jon "believes some of the beneficial effects of the RFA procedure are beginning to wear off.  He knew that this would happen because that is what the doctor told him to expect, but he was hoping to get longer lasting relief.  Jon was advised that the procedure can be repeated, so he is considering when he should return;"

    c.   Jon has a "life expectancy is another 29.7 years" and "[t]hat is a long time to continue to suffer from the physical and mental or emotional issues this crash has created for Jon;"

    d.   "Jon will undoubtedly continue to need medical care for his injuries;"

    e.   "Jon is also entitled to compensation for pain and suffering, mental or emotional anguish, disability, and loss of enjoyment of life. The changes to his life from this crash are truly life altering. This is not the way Jon thought he would have to live his life;" and

    f.   A copy of the Social Security Administration's life expectancy calculation for Jon's age.

43.    Finally, Jon's attorney concluded the March 13, 2024, letter with the following statement, "I believe Dairyland has all of the information necessary to make this tender, but if you have questions or believe any other documentation is necessary, please let me know."

44.    On April 4, 2024, Jon's attorney sent copies of Jon's medical records and bills from Balanced Spine and New Hope Chiropractic by email to the Adjuster "in further support of our request for our tender of Mr. Brown's insurance policy limits," along with a reminder that "we made that policy limits settlement offer on March 13, 2024."

45.    On April 11, 2024, the Adjuster advised that she never received Jon's initial request for the tender of the Policy limits and requested a copy. Jon's attorney sent a copy of that letter on the same day.

46.    On April 12, 2024, at the request of the Adjuster, Jon's attorney agreed to extend the deadline to respond to the request for the Policy limits from April 15, 2024, until April 19, 2024.

47.    On April 15, 2024, the Adjuster informed Jon's attorney that "the only records received for Jonathan are the prior chiropractic records as well as the chiropractic records for treatment related to this loss. No other records were received."

48.     On the same day, Jon's attorney emailed the Adjuster a Dropbox link containing copies of Jon's medical records and bills previously sent to the Adjuster on February 14, 2024, and April 4, 2024, including the medical records from Avera Physical Medicine and Rehabilitation, Balanced Spine, New Hope Chiropractic, and the medical bills from ERMED, Avera McKennan, and Aurora Healthcare.

49.     Also on April 15, 2024, Jon's attorney sent an email to the Adjuster asking whether she wanted medical records relating to an unrelated and previously planned shoulder surgery Jon had from a pre-existing injury, advised that he was waiting to receive physical therapy records and bills and would send them when they became available, and "extend[ed] the settlement deadline for at least two weeks after we provide you with those records and bills[.]"

50.     On April 16, 2024, the Adjuster emailed Jon's attorney stating that she did not need the shoulder surgery medical records, confirming that she received "the link" containing Jon's medical records and had "forwarded it to my IT department so they can download the records, which is what I am missing," and that she would "keep an eye out for the P/T records."

51.     Jon's attorney responded to the above email on the same day, writing, in part, "[w]e are waiting for records regarding Jon Brown's PT and the records from Aurora Health, where he was treated after the crash occurred.  For some reason they sent us the bills but not the records.  He had PT with the same person for his shoulder, which is unrelated, and for his neck.  We will forward those when we get them from the providers."

52.     On April 24, 2024, the Adjuster sent an email to Jon's attorney writing, in part, "[p]er my review, [Jon's] first treatment date for this loss was with the chiropractor on 7/18/23.  Did he go to the ER or an urgent care after the accident?  If so, I do not have any of those bills or records. I am also missing the physical therapy records, his primary care physician records, and the pain clinic

records. Please let me know if you will cancel the time limit demand on Jon until all of those records are received."

53.     Jon's "pain clinic" records and his medical bills from the emergency room were previously sent to the Adjuster on February 14, 2024, and again on April 15, 2024, after the Adjuster advised at that time that she only had Jon's "chiropractic records."

54.     Jon's attorney responded to the April 24, 2024, email from the Adjuster, writing, in part, "[y]es, we are off the calendar for the time limited settlement offer until we get the records we both need.  I will check into this and let you know."

55.     On June 10, 2024, Jon's attorney sent a letter via email to the Adjuster conveying Jon's second request for a tender of the applicable limits under the Policy by June 28, 2024.

56.     In the June 10, 2024, letter, Jon's attorney documented the continuing impact of Jon's injuries by providing the following information, among other details:

    a.   Copies of Jon's medical records from Aurora Health Care, Avera Medical Group Psychiatric, Avera Orthopedics and Sports Medicine, and Avera Physical Therapy;

    b.   Jon "could tell the effects of" the RFA procedure he had "on his neck in early December of 2023" were "starting to wear off and his neck pain [was] starting to come back;"

    c.   Jon believed "he will need another neck [RFA] procedure.  These procedures are very expensive, but they do provide pretty decent long term pain relief. However, the procedure was pretty painful;"

    d.   Jon was prescribed Meloxicam after his shoulder surgery and he was "happy" it was "also help[ing] his neck," but Jon had "been advised that he cannot stay on Meloxicam long-term;"

    e.   Jon's "neck pain continues to plague him despite the RFA," that the pain "is nagging," "[h]is neck is basically sore all of the time," and even when his neck "doesn't hurt much," he would still "typically rate [the pain] at a 2;"

11

f.  Jon is still able to do his job and the other things we all have to do but [the neck pain] is just always there," he "will wake up with pain in the morning frequently," and "it is there all day long . . . and when he goes to bed at night, too;"

g.  "The more [Jon] does, such as riding a motorcycle, the more it hurts. Jon can ride with pain, but his biggest concern is being able to turn his head to stay a safe rider;"

h.  "Jon typically takes ibuprofen several times a day. He does not like having to do that and live like this. He also uses Biofreeze on a regular basis" and a "heating pad for his neck regularly;"

i.  Photographs of a tube of Biofreeze, a large bottle of "extra strength" Acetaminophen, and the heating pad on Jon's chair; and

j.  "Jon is also worried because the mental component of what he has gone through is still will him. He is especially worried he won't be able to keep riding [motorcycle] into his late 60s. This is the single biggest enjoyment in his life, and not being able to continue doing so is worrisome."

57.   Jon's attorney made the following request in the June 10, 2024, letter: "[p]lease review my letters of February 6 and March 13 as well because they will help Dairyland understand the gravity of the injuries Jon sustained in this collision and the continuing effects. There is no question but this case would result in a verdict well in excess of the insurance policy limits if it goes to trial."

58.   Jon's attorney also explained in the June 10, 2024, letter, "I have not had a better case to try since the Gene Weber verdict I obtained several years ago. I am attaching a copy of that verdict here. However, I have successfully settled at least a half dozen cases far greater than $1M between then and now, a couple of which were for more than $3M. This is one of those cases."

59.   Finally, the June 10, 2024, letter noted that Jon originally chose Dairyland "because of their excellent reputation in the motorcycle community. He believed Dairyland would take care of him if anything like this happened. He bought this insurance for peace of mind."

60.   On June 17, 2024, Jon's attorney sent a letter to the Adjuster by email providing a reminder of the deadline to tender the applicable Policy limits by June 28, 2024, and conveying the following information, among other details:

a.  A copy of the South Dakota Pattern Jury Instruction wherein the jury is instructed that "it 'must' award damages for past and future medical expenses, disability, physical pain and suffering, mental anguish, and loss of enjoyment of life. Here those damages are significant, as we have demonstrated;"

b.  "As shown in my letter of March 13, Jon Brown has a life expectancy of another 29.7 years. Of course, his injuries and damages began 11 months earlier, so the total time that our jury would consider is 30.6 years. That is 11,169 days or 268,056 hours of his life. If the jury verdict for the non-economic damages was just $1 an hour for disability, $1 an hour for physical pain and suffering, $1 an hour for mental anguish, and $1 an hour for loss of enjoyment of life, that part of the verdict would be $1,072,224. Then we would need to include the medical bills. There is no doubt that our verdict would greatly exceed the $250,000 insurance policy limits;" and

c.  A copy of a "recent underinsured motorist verdict in *Fiechtner v. American West Insurance Company*. This case was tried in the relatively rural county that adjoins the county where Jon Brown lives. As you can see, the jury verdict from April 15, 2024, was for a total of $1,540,000."

61.     On June 27, 2024, the Adjuster sent a letter denying Jon's second request to tender the applicable Policy limits, writing, in part: "[t]his letter follows a message I left for you today. I advised that, based on the medical documentation which you have provided for Jon Brown to date, we do not have the injury valued at the policy limit. But in an effort to try and resolve this uninsured motorist bodily injury claim, we are able to extend an offer of $120,000 in settlement of his injury claim."

62.     As of June 10, 2024, Jon had provided the Adjuster with copies of his medical records from: (1) Balanced Spine; (2) New Hope Chiropractic; (3) Avera Physical Medicine and Rehabilitation; (4) Aurora Health Care, the hospital in Milwaukee where Jon sought emergency care; (5) Avera Medical Group Psychiatric; (6) Avera Physical Therapy; and (7) Avera Orthopedics and Sports Medicine.

63.     As of June 10, 2024, Jon had provided the Adjuster with copies of his medical bills from: (1) Avera McKennan, the entity which, upon information and belief, provides the billing

records for all Avera locations in Sioux Falls; (2) Aurora Health; (3) ERMED, a bill related to Jon's emergency department visit; (4) Balanced Spine; and (5) New Hope Chiropractic.

64. The Adjuster did not request any additional documentation from Jon before or after sending the denial letter of June 27, 2024.

65. On July 19, 2024, Jon's attorney sent a letter via email to the Adjuster conveying Jon's third request for a tender of the applicable limits under the Policy by July 31, 2024.

66. In the July 19, 2024, letter, Jon's attorney explained and documented the continuing impact of Jon's injuries by providing the following information, among other details:

   a. Jon was having his second [RFA] on August 12, 2024, and Jon is nervous about this because it is a painful procedure. Jon said he felt like he was going to pass out the first time they did the procedure;

   b. That the RFA procedure "is also costly;"

   c. Copies of new medical records and bills from Anesthesiology Associates and Avera McKennan Hospital that would "further support the discussions we have had regarding the [RFA] procedures;"

   d. Jon "thought about not going to the Sturgis motorcycle rally this year because riding is not easy for him like it used to be, but he decided to gut it out and go, primarily because he has not missed a year since 2007. He realizes it will take longer to get there and he will need to make accommodations along the way that he never needed to make before he was hurt in this crash;"

   e. "Jon feels like a prematurely old man;" and

   f. Jon's co-worker came up to him out of the blue and asked, "whatever you had done to your neck has either quit working or worn off, right?" because he noticed Jon is moving differently than he has been and is obviously in pain and guarding his neck. Jon was not aware he was doing this, but his co-worker said, "look at yourself, you're standing there like it hurts to move."

67. Jon's attorney also explained in the July 19, 2024, letter that Jon feels like Dairyland is "not being fair in its valuation of how this has affected him and how it will continue to affect him for the rest of his life," considering that:

   a.  "Jon and Angie's motorcycle went between the guardrail and a car. He feels fortunate to be alive because he knows he probably should not be here given how the crash occurred;"

   b.  Jon has provided "update after update on how this crash has affected" him, "photos showing what Jon does at home to deal with his pain," descriptions of "how his life has changed because of his crash injuries," the Social Security Administration's life expectancy calculation because the crash and his injuries will continue to affect him for the rest of his life," and "our calculation of the value of this case;" and

   c.  "Dairyland is aware of the costs of the radiofrequency ablation procedures and how long they last."

68.    Finally, Jon's attorney advised in the July 19, 2024, letter that "[t]here is no doubt that our jury will return a verdict significantly higher than Jon's insurance policy limits," and "I would urge Dairyland to review the various updates we have provided and tender the policy limits."

69.    Dairyland did not respond to Jon's third request that it tender the applicable Policy limits on or before the deadline of July 31, 2024.

70.    On August 6, 2024, Jon's attorney sent the Adjuster a letter via email to confirm that no response was sent to the July 19, 2024, letter.

71.    Upon information and belief, on August 8, 2024, the Adjuster forwarded the email from Jon's attorney on July 19, 2024, which attached the July 19, 2024, letter and a Dropbox link to its enclosures to "ImagingSolutionCenter@sentry.com" and wrote, in part: "Can you please download the 'dropbox' link/items to Documents?"

72.    Rachel Malsom responded to the Adjuster's email on August 9, 2024, with the Adjuster and Jon's attorney included as recipients, writing, "I downloaded all of the documents and was able to upload 3 of the 4 parts to the claim," and requesting that Jon's attorney "please send these documents again directly to imagingsolutioncenter@sentry.com and I can download everything again and see if I can upload everything then---"

73.     Rachel Malsom's email signature identified her as a "Claims Tech II" in "Claims Data Administration" for "Sentry Insurance Company," and included Sentry's mailing address, and logo.

74.     Upon information and belief, Rachel Malsom was at all times relevant hereto an employee of Sentry.

75.     On the same day, August 9, 2024, Jon's attorney complied with Rachel Malsom's request and emailed the subject Dropbox link to imagingsolutioncenter@sentry.com.

76.     No additional communications were shared between Jon's attorney and the Adjuster or any other representative for Dairyland or Sentry until August 19, 2024.

77.     On August 19, 2024, Jon's attorney sent a letter via email to the Adjuster conveying Jon's request for a tender of the applicable limits under the Policy by August 23, 2024, writing: "[t]here is absolutely no doubt that this is a policy limits case, and if the limits are not tendered by that date and time, we will proceed by filing suit."

78.     Jon's attorney explained and documented the continuing impact of Jon's injuries in the August 19, 2024, letter by providing the following information, among other details:

    a.  Jon and Angie's recent trip to Sturgis on his motorcycle about "did him in" due to "[t]he combination of fighting wind on the way home and some physical activity at a charity event Jon has volunteered at for 13 years were just too much for him to handle and participate in typical activities;"

    b.  It was "very hard" for Jon "have [his] head on a swivel," which is necessary when you ride at an event like the Sturgis Motorcycle Rally;"

    c.  Jon's "neck was very sore when they returned home" and that he may have "to take his pickup to Sturgis next year;"

    d.  "Jon was disappointed because he would make rides like this regularly before this crash;"

    e.  Jon was "planning on riding to Fargo with some friends the following weekend, but he had to tell them he can't do it. Anyone who knows Jon knows he does not cancel planned rides;"

    f.   Jon and Angie "have travelled half as much this year compared to prior years, and the rides he has taken have required him to ride in pain;"

    g.   Jon had his second RFA on August 12, 2024, and he had been "pretty rough in terms of soreness" and "basically useless" for three days following the procedure;

    h.   Jon was "hopeful that the results are just as good as they were the first time so he can get a couple of good months of motorcycle riding in before winter;" and

    i.   A photograph showing the bandages that were applied on Jon after the procedure.

79.    On August 22, 2024, the Adjuster sent an email to Jon's attorney providing that she had "been out of the office unexpectedly" and that Jon's claim was "under review by upper management due to the amounts involved. I wish I could tell you I would have a response to you by tomorrow, but I can't promise that. I will contact you as soon as I hear back from management."

80.    On August 23, 2024, the Adjuster advised Jon's attorney over the phone that Jon's fourth request for the applicable Policy limits was denied.

81.    During this call, the Adjuster conveyed a settlement offer to resolve Jon's claim for $150,000 and advised that this offer was based on what they were "seeing," which, according to the Adjuster, was the receipt of $78,000 worth of medical bills from Jon.

82.    The Adjuster advised that Dairyland and, upon information and belief, Sentry, attributed approximately $57,000 of the $78,000 in medical bills to the collision.

83.    The Adjuster also represented during this call that there had been a lot of eyes "on this one" and that Dairyland and, upon information and belief, Sentry, have Word documents on what is related and not related.

84.    Jon's attorney asked the Adjuster during this call to describe what is not related in writing, and the Adjuster verbally referenced Jon's shoulder surgery.

85.     Following this call, the Adjuster sent a letter to Jon's attorney formally denying Jon's fourth request to tender the applicable Policy limits and "extend[ing] an offer of settlement for Jon's uninsured motorist bodily injury claim of $150,000."

86.     The August 23, 2024, letter did not provide any further detail as to what treatment Jon has received that Dairyland and, upon information and belief, Sentry, claims is and is not related to the collision or request any additional documentation from Jon.

87.     On October 10, 2024, Jon's attorney spoke with the Adjuster by telephone and explained that Jon's RFA procedures have done relatively well for him, but the pain will slowly start to come back and he will need another one, and that Jon is not moving on the value of his claim.

88.     No offer was made by Dairyland or Sentry to tender the applicable Policy limits during the phone call on October 10, 2024.

89.     On October 24, 2024, Jon's attorney again spoke with the Adjuster by telephone. During this conversation, Jon's attorney conveyed that Jon's position had not changed and that Jon may file suit.

90.     When the Adjuster asked why Jon would file suit before the most recent medical records and bills for his second RFA were available, Jon's attorney responded that another $10,000 medical bill was not going to close the $100,000 gap between them.

91.     No offer was made by Dairyland or Sentry to tender the applicable Policy limits during the phone call on October 24, 2024.

92.     Dairyland has never tendered any amount in payment to Jon, not even payment for his medical bills from the crash.

93.     Dairyland's claims handling process is designed to deny paying its insureds, including Jon, the full amount owed under the policy.

18

94.    Dairyland had a systematic practice of limiting its payments to its insureds by failing to conduct a reasonable evaluation and identifying an intentionally or recklessly low amount of benefits owed under the policy.

95.    Dairyland knew or recklessly disregarded that its evaluation was biased in favor of Dairyland.

96.    Dairyland knew or recklessly disregarded that its offers to Jon were less than the full amount owed under the uninsured motorist coverage as a result of the motorcycle collision.

## COUNT ONE
### BREACH OF CONTRACT

97.    Jon realleges the facts set forth in the preceding paragraphs as if fully set forth herein.

98.    Under the terms of the Policy, Jon is entitled to payment for all of the damages he sustained as a result of the July 14, 2023, collision based upon the evidence submitted to Defendants, including, but not limited to, medical records, medical bills, photographs, information concerning Jon's injuries, treatment, and prognosis, information concerning the impact Jon's injuries were having on his work, daily activities, and hobbies, and status updates, amongst other information.

99.    Dairyland breached its contract of insurance by failing to pay the full amount of the underinsured policy benefits to which Jon has shown he is entitled under the Policy that Dairyland sold to him, including damages for loss of consortium.

100.    As result of Dairyland's breach of contract, Jon has been damaged in an amount to be proven at trial.

## COUNT TWO
### INSURANCE BAD FAITH

101.    Jon realleges the facts set forth in the preceding paragraphs as if fully set forth herein.

102.    At all times relevant to this Complaint, Dairyland owed Jon the duty of good faith and fair dealing.

103.    The duty of good faith and fair dealing that Dairyland owed to Jon included the duty to refrain from unfair or deceptive practices as defined by South Dakota law.

104.    Dairyland breached the duty of good faith and fair dealing that it owed to Jon.

105.    Dairyland's breach of the duty of good faith and fair dealing, with regard to Jon's claim for UM benefits includes, but is not limited to:

  a.   the failure to reasonably investigate the claim;

  b.   failure to reasonably evaluate the claim;

  c.   failure to give due weight to the insured's interests;

  d.   using an unreasonable claims handling process designed to maximize its profits at its insured's expense, including Jon;

  e.   utilizing an unreasonable claims handling process designed to deny payment of the full amount of benefits owed under the terms of the policy to its insureds, including Jon;

  f.   failure to pay the amount of Jon's medical bills; and

  g.   failure to provide a reasonable explanation for denial of the insured's claim for the uninsured motorist benefits requested.

## COUNT THREE
### PUNITIVE DAMAGES

106.    Jon realleges the facts set forth in the preceding paragraphs as if fully set forth herein.

107.    Dairyland's conduct was willful, wanton, and in reckless disregard of the rights of Jon, and Dairyland acted with malice and oppression towards Jon, such that Jon has been damaged in an amount to be determined at trial.

108.    Jon's damages for Dairyland's conduct, include, but are not limited to, punitive and exemplary damages to punish such conduct in his case and deter such conduct in other cases.

20

## COUNT FOUR
### VEXATIOUS REFUSAL TO PAY

109.    Jon realleges the facts set forth in the preceding paragraphs as if fully set forth herein.

110.    Dairyland's failure to pay Jon the full amount of UM benefits due under the Policy sold to Jon is vexatious and without reasonable cause such that Jon is also entitled to recover his reasonable attorney's fees under SDCL § 58-12-3.

## COUNT FIVE
### PIERCING THE CORPORATE VEIL/ALTER EGO

111.    Jon realleges the facts set forth in the preceding paragraphs as if fully set forth herein.

112.    Upon information and belief, Dairyland is a wholly owned subsidiary of Sentry and has the same headquarters as Sentry, 1800 North Point Drive, Stevens Point, WI 54481.

113.    Upon information and belief, Dairyland has no employees of its own and all of its operations are conducted by Sentry's employees in accordance with Sentry's policies and procedures.

114.    Upon information and belief, the members of Dairyland's board of directors are officers of Sentry.

115.    Upon information and belief, insurance policies issued by Dairyland are underwritten by members of Sentry Insurance Group;

116.    There is a unity of interest and ownership between Dairyland and Sentry such that the separate personalities of Dairyland and Sentry are indistinct or non-existent, such that the above claims should apply to Sentry as an alter ego of Dairyland because, upon information and belief,

a.  Dairyland's operations are controlled by Sentry in accordance with Sentry's business practices and internal controls;

b.  Dairyland does not have sufficient capital to conduct its own business operations;

    c.   Sentry uses the corporate shell of Dairyland to collect and profit from premiums paid by insureds, including Jon; and

    d.   Dairyland is a mere instrumentality of Sentry.

117.    Adherence to the fiction of a separate corporate existence for Dairyland and Sentry would sanction fraud, promote injuries or inequitable consequences or lead to an evasion of legal obligations because, upon information and belief:

    a.   Sentry is an insurance carrier which owes a duty of good faith and fair dealing to insureds;

    b.   Sentry promulgates internal policies and procedures for its claims adjusters to use when approving and denying claims under insurance policies sold by Dairyland to insureds;

    c.   All of Dairyland's representatives that communicated with Jon and/or his agents were all employees of Sentry, including, but not limited to, Rachel Leech, Rachel Malsom, Aaron Hayes, and Gordon Eberlin;

    d.   Sentry's internal policies and procedures were applied when adjusting Jon's claim for UM benefits under the Policy, which conduct breached the Policy and the duty of good faith and fair dealing, was malicious and oppressive to Jon, and was wanton, willful, and in reckless disregard of Jon's rights;

    e.   Sentry's internal policies and procedures were used to deny Jon's claim for the full amount of UM benefits under the Policy, which denial was vexatious and without reasonable cause;

    f.   Sentry used Dairyland as an alter ego to vexatiously deny Jon's claim for UM benefits under the Policy without cause and in a manner which breached the duty of good faith and fair dealing, was malicious and oppressive to Jon, and was wanton, willful, and in reckless disregard of Jon's rights;

    g.   Sentry has aided and abetted Dairyland's provision and administration of liability insurance, including the Policy sold to Jon;

    h.   Dairyland acted as an instrumentality of Sentry when adjusting and denying Jon's claims for UM benefits under the Policy; and

    i.   Sentry and Dairyland acted as one organization when adjusting and denying Jon's claims for UM benefits under the Policy.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Jon requests a judgment against Defendants as follows:

1.      For full and fair compensatory, general, and special damages in an amount to be determined by the jury to compensate Jon for all benefits to which he is entitled under the Policy;

2.      For attorney's fees and costs pursuant to SDCL § 58-12-3;

3.      For pre-judgment and post-judgment interest to the fullest extent allowed by law;

4.      For punitive damages to punish Defendants' wrongful conduct toward Jon and to deter such conduct in other cases; and

5.      For such other and further relief as deemed just and equitable by the Court.

**<u>PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY</u>**

Dated this 10th day of January, 2025.

CUTLER LAW FIRM, LLP

*/s/ Michael D. Bornitz*
Michael D. Bornitz
Abigale M. Farley
140 North Phillips Avenue, 4th Floor
PO Box 1400
Sioux Falls, SD 57101-1400
Telephone: (605) 335-4950
mikeb@cutlerlawfirm.com
abigalef@cutlerlawfirm.com
  *Attorneys for Plaintiff*

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JONATHAN BROWN

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michael D. Bornitz
Abigale M. Farley
Cutler Law Firm. LLP

## DEFENDANTS

DAIRYLAND INSURANCE COMPANY, a subsidiary of
SENTRY INSURANCE COMPANY

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | **PERSONAL INJURY** ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Breach of Contract; Bad Faith; Punitive Damages; Vexatious Refusal to Pay; Piercing the Corporate Veil/Alter Ego

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
January 10, 2025

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE